## GUZOWSKI v DETROIT RACING ASSOCIATION, INC

Docket No. 67964. Submitted July 28, 1983, at Detroit.—Decided November 7, 1983.

Frank Guzowski brought an action against the Detroit Racing Association, Inc., for damages for injury to plaintiff's horse. The jury returned a verdict for plaintiff and the Macomb Circuit Court, Raymond R. Cashen, J., ordered that plaintiff accept a *remittitur* or face a new trial. Plaintiff appealed. *Held:*

1. The trial court's order was not a final order. Plaintiff should have sought leave to appeal. However, the Court of Appeals may, in its discretion, decide a dispute on the merits where a litigant seeks review of a circuit court order by one method when the litigant should have sought review by another method and where the Court does, in fact, have the legal authority to resolve the underlying merits of the action.

2. The Court of Appeals should review a trial court's order granting *remittitur* to determine whether the Court's order was clearly erroneous in light of its findings and the rules set forth for determining when *remittitur* is permissible. The verdict was within the range of the evidence presented, did not evidence jury bias, prejudice or passion, and does not shock the conscience of the Court. The trial court clearly erred in granting *remittitur* or a new trial.

Reversed and remanded for reinstatement of the original verdict.

1. Appeal — Court of Appeals — Court Rules.

The Court of Appeals may, in its discretion, decide a dispute on the merits where a litigant seeks review of a circuit court order by one method when the litigant should have sought review by another method and where the Court does, in fact, have the legal authority to resolve the underlying merits of the action (GCR 1963, 820.1[7]).

References for Points in Headnotes
[1] 4 Am Jur 2d, Appeal and Error §§ 55, 63.
[2, 4] 22 Am Jur 2d, Damages §§ 366, 367.
[3] 5 Am Jur 2d, Appeal and Error § 939.
[4] 5 Am Jur 2d, Appeal and Error § 944.

2. TRIAL — *REMITTITUR*.

  A trial court cannot substitute its judgment on damages for that of the jury unless a verdict has been secured by improper methods, prejudice or sympathy or, alternatively, if the verdict is so clearly excessive as to shock the judicial conscience.

3. APPEAL — *REMITTITUR*.

  The Court of Appeals should review a trial court's order granting *remittitur* to determine whether the court's order was clearly erroneous in light of its findings and the rules set forth for determining when *remittitur* is permissible.

4. APPEAL — *REMITTITUR*.

  A trial court clearly errs in ordering *remittitur* where the verdict is within the range of the evidence presented, does not evidence jury bias, prejudice or passion and does not shock the judicial conscience.

*Kiefer, Allen, Cavanagh & Toohey* (by *Robert E. Toohey*), for plaintiff.

*Donald J. Morbach & Assoc., P.C.* (by *Murray Grayson*), for defendant.

Before: WAHLS, P.J., and HOOD and R. R. LAMB,* JJ.

R. R. LAMB, J. Plaintiff instituted this lawsuit in March, 1979, in the Macomb County Circuit Court, alleging that the acts of defendant's agents resulted in the crippling of his horse, Shapely Miss, in November, 1978. On June 10, 1981, following a trial in the circuit court, the jury returned a verdict in plaintiff's favor and set his damages at $136,000. Thereafter, on July 13, 1981, defendant filed a motion for a new trial. On October 5, 1982, the trial court issued its opinion, which provided in pertinent part:

"A new trial is denied to the defendants conditioned upon the acceptance by the plaintiff of a reduction in

---

* Circuit judge, sitting on the Court of Appeals by assignment.

the jury award of $111,000.00 with the final award being in the amount of $25,000.00. Plaintiff shall express his intention in regard to this *remittitur* within sixty (60) days hereof. In the event the *remittitur* is not accepted by the plaintiff, then a new trial is hereby granted."

Plaintiff did not accept the judgment in the reduced amount but, rather, took an appeal from the lower court's order entered on October 25, 1982, which order incorporated the *remittitur* and new trial provisions set forth above.

Before turning to the sole issue actually raised on appeal, we must first address an important question not raised by the parties going to this Court's jurisdiction to resolve this case on the merits. Plaintiff claimed an appeal as of right from the lower court's order which granted *remittitur;* however, because the *remittitur* was not accepted, under the terms of the court's order, a new trial was granted. An order granting a new trial is not a "final order" because it does not affect with finality the rights of the parties in the subject matter of the dispute. *Conlon v State Treasurer,* 23 Mich App 646; 179 NW2d 208 (1970).

When a party claims an appeal from an order which is properly reviewable only by leave granted, some panels of this Court have held that they lack jurisdiction to entertain the appeal and that the appeal must be dismissed. *Downriver Loan Co v Gabbert,* 37 Mich App 411; 195 NW2d 34 (1971); *Conlon, supra.* On the other hand, some panels of this Court have held that they have discretion under GCR 1963, 820.1(7), to reach the merits of the appeal in such cases by treating the pleadings as an application for leave to appeal and granting the same. *Moore v Ninth District Judge,* 69 Mich App 16, 18-19; 244 NW2d 346 (1976), *lv*

*den* 397 Mich 848 (1976); *People v Currie,* 59 Mich App 659; 229 NW2d 818 (1975).

In our opinion, those decisions which find no jurisdictional barrier to appellate review when a litigant fails to seek appellate review of an interlocutory order by leave are the better reasoned. When a litigant mistakenly claims an appeal by right, the issue may be analyzed as posing a problem of jurisdiction over the person or over the subject matter. If analyzed as a personal jurisdiction problem—that by claiming an appeal by right where none exists this Court fails to obtain jurisdiction over the person—the nonappealing party's failure to assert the jurisdictional defect in the first responsive pleading or motion should be deemed to waive the defect. See GCR 1963, 116.2; *Edwards v Meinberg,* 334 Mich 355, 358-359; 54 NW2d 684 (1952).

If the problem is analyzed as going to the court's subject-matter jurisdiction, however, the issue may be raised at any time. *Bandfield v Wood,* 104 Mich App 279, 281-282; 304 NW2d 551 (1981). This case clearly does not involve a classic challenge to the court's subject-matter jurisdiction, namely: a challenge going to the very authority of a court to ever adjudicate a class of cases. See, *e.g., Brockman v Brockman,* 113 Mich App 233; 317 NW2d 327 (1982) (Court of Appeals has no jurisdiction to entertain appeals from cases resolved by a "private judge" outside of state judicial channels); *Bandfield, supra* (Court of Claims or circuit court); *Kita v Matuszak,* 21 Mich App 421; 175 NW2d 551 (1970), *lv den* 383 Mich 806 (1970) (Michigan circuit court or federal district court). By way of contrast, this Court clearly has jurisdiction to entertain an appeal from an order entered by the circuit court. GCR 1963, 806.1 and 806.2(2). The

problem posed here does not go to this Court's power or authority to render judgment in a class of cases but, rather, concerns merely how this Court should respond when a litigant seeks review of a circuit court order by one method when the litigant should have sought review by another method and where it is undisputed that this Court does, in fact, have the legal authority to resolve the underlying merits of the action.[1]

Since we have concluded that we may, in our discretion, resolve this dispute on its merits, we now turn to the question of whether we should, in fact, address the substance of this appeal at this time. We conclude that, under the circumstances of this case, we should treat plaintiff's claim of appeal as an application for leave to appeal and hereby grant the same. Given that defendant has never asserted plaintiff's failure to file for leave to appeal as a basis for dismissing this case, and given that the Clerk of this Court incorrectly accepted this appeal as one of right, it appears that the question of whether a litigant should seek appellate review of a *remittitur* order by leave or

---

[1] The doctrine that a jurisdictional barrier is posed when a litigant seeks appellate review as of right of an order only reviewable by leave has inglorious origins. In *Colon, supra,* this Court relied on *Fox v Bd of Regents of University of Michigan,* 375 Mich 238, 242; 134 NW2d 146 (1965), and a series of Court of Appeals, decisions traceable to *Standard Building Products Co v Woodland Building Co,* 1 Mich App 434; 136 NW2d 744 (1965). In *Fox,* the plaintiffs erroneously filed an action over which the Court of Claims had exclusive jurisdiction in circuit court. Thus, *Fox* involved a classic subject-matter jurisdiction problem. In *Standard Building Products,* this Court held that an order merely granting a motion for partial summary judgment is not a final order which is appealable by right and dismissed the appeal. The *Standard Building Products* Court did not characterize the problem as jurisdictional, however. Instead, the Court relied simply on a construction of the applicable court rules. Thereafter, different panels of this Court began to cite *Standard Building Products* or decisions citing this case for the proposition that this Court lacks jurisdiction over those cases in which a litigant erroneously claims an appeal as of right.

by right is not patently obvious to competent attorneys. Responsibility for allowing this matter to proceed this far as an appeal by right must be shared by both parties and this Court. It would be a colossal waste of time and effort to dismiss this matter after the parties have researched and briefed only the merits of the appeal, after oral arguments have been held, and after a substantial commitment of time has been made by this Court in the resolution of the appeal. We might conclude otherwise were we convinced that a strong likelihood existed that, if this Court dismissed the appeal, we would never have to address the merits of the case. Here, however, following a new trial, plaintiff would enjoy an appeal by right which would encompass the very issue presented here. Rather than allowing this case to become stalled by unraised procedural complexities, we determine that this appeal should be resolved on its merits.

We now turn to the sole claim raised on appeal, namely: that the trial court erred in ordering *remittitur* pursuant to GCR 1963, 527.5. We must first consider the standard of appellate review to be applied in this case. A trial court cannot substitute its judgment on damages for that of the jury unless a verdict has been secured by improper methods, prejudice or sympathy or, alternatively, if the verdict is so clearly excessive as to shock the judicial conscience. *Belin v Jax Kar Wash No 5, Inc,* 95 Mich App 415, 423-424; 291 NW2d 61 (1980), and authorities cited therein. Typically, cases which raise *remittitur* issues involve personal injuries, and, because personal injury cases involve assigning a monetary value to the pain and suffering experienced by the plaintiff, which value cannot be measured by an absolute standard, the courts—both trial and appellate—have

been very reluctant to allow verdicts in personal injury cases to be disturbed. See, *Pippen v Denison Division of Apex Corp,* 66 Mich App 664, 674-675; 239 NW2d 704 (1976), *lv den* 399 Mich 823 (1977), and authorities cited therein.

Our research has uncovered no Michigan decisions in which the trial court ordered *remittitur* and where the lawsuit involved solely damages to property. However, the general rule in property cases is that a verdict may be altered where fixed rules are applicable to the determination of the damages and it can be ascertained that these rules were disregarded in rendering the verdict. As stated in 22 Am Jur 2d, Damages, § 370, p 477:

> "The rule that a judgment will not be reversed on the ground that the damages are excessive unless they are so excessive as to induce the belief that the verdict was the result of passion, prejudice, or corruption applies in actions for damages for injuries to property where no rules are prescribed by law for ascertaining the damages. A verdict in such an action may be set aside as excessive, however, where the damages are to be measured by fixed rules and principles, so that it may be known that there is an error in the verdict, as where they are imposed according to the value of the property, which may be ascertained by evidence." (Footnotes omitted.)

As the trial court found, the proper measure of damages in this case is the difference in the market value of the horse after it was injured from its preinjury market value. *Davidson v Michigan C R Co,* 49 Mich 428, 431; 13 NW 804 (1882). Our review of the trial court's order of *remittitur* will be undertaken with this principle in mind.

Several appellate opinions have stated that, on review of a lower court's decision to grant *remittitur,* the question is whether the lower court

abused its discretion. *Inter alia: Stevens v Edward C Levy Co,* 376 Mich 1, 6; 135 NW2d 414 (1965); *Beachum v Bay Valley Associates,* 120 Mich App 412, 420; 328 NW2d 54 (1982); *Belin, supra,* p 424; *Pippen, supra,* p 674. In fact, in almost all of the reported cases in which the trial court has granted *remittitur* following a jury trial, its decision has been reversed. In the majority of these cases, although the jury's verdict could be viewed as falling within the permissible range of the proofs, it is nonetheless difficult to understand how the jury determined that the plaintiff sustained damages in the amount awarded.

The Michigan Supreme Court has defined "abuse of discretion" in *Spalding v Spalding,* 355 Mich 382, 384-385; 94 NW2d 810 (1959), as follows:

"The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias."

In *People v Tally,* 410 Mich 378, 386-387; 301 NW2d 809 (1981), the Supreme Court reaffirmed its professed fealty to the *Spalding* definition of "abuse of discretion".[2] Clearly, however, under the

---

[2] In criminal cases, "abuse of discretion" has supposedly been given a "somewhat stricter interpretation". *Tally, supra,* p 387, citing *People v Charles O Williams,* 386 Mich 565, 573; 194 NW2d 337 (1972). *Charles O Williams* uses the identical terminology as *Spalding* in defining "abuse of discretion". Thus, no difference in the application of this standard can be logically premised upon a difference in the definition of the term "abuse of discretion" in the civil and criminal cases. In precisely what manner "abuse of discretion" is subject to a "somewhat stricter interpretation" in criminal cases, then, is never delineated by the Supreme Court, leaving this Court,

*Spalding* abuse of discretion standard none, or almost none, of the appellate decisions reversing trial courts which granted *remittitur* are correct.[3]

In view of the foregoing, since the Supreme Court has not seen fit to define "abuse of discretion" contextually by reference to the particular legal rules within which the discretionary determination is to be made, we do not deem it advisable to profess that "abuse of discretion" is the standard of review when we are clearly not adhering to the *Spalding* definition of this term.[4] Rather,

the bar, and litigants to guess what the distinction may be. We could, of course, claim to apply a somewhat stricter abuse of discretion standard in *remittitur* cases, but this would merely further confuse the meaning of "abuse of discretion".

[3] We do not believe it can be said that a trial court has exhibited "perversity of will", the defiance of judgment, or the exercise of passion or bias, when what it has done is to order *remittitur* where, although the jury's verdict on damages may be viewed as falling within the range of the evidence adduced, the damages award clearly exceeds the maximum amount which the lower court deems supportable. See, *e.g., Pippen, supra,* where this Court found that the lower court committed an "abuse of discretion" in ordering *remittitur,* where a jury awarded the unprecedented sum of $1,750,000 to a 67-year-old man, who had lost his arm as a result of an industrial accident, and his wife. Evidence showed that if the man had worked until he was 81, his lost wages would have been some $141,000 and total medical expenses were less than $2,000.

[4] *Cf. People v Gleason,* 122 Mich App 482, 487-488; 333 NW2d 85 (1983), (abuse of discretion standard, contrary to the weight of authority "of rather dubious parentage" in the Court of Appeals, does not apply to review of the sufficiency of an affidavit for a search warrant) stated:

"Of course, it can be argued that the standard employed makes little difference. Nevertheless, when an appellate court states that 'the trial court's decision will not be reversed absent a clear abuse of discretion', it generally means that 'the trial court's decision will not be reversed'. This Court must not avoid its solemn responsibility to enforce the warrant clause by pretending that it has the power to correct only the most egregious of errors. See *People v Tally,* 410 Mich 378, 396-397; 301 NW2d 809 (1981) (LEVIN, J., *concurring):*

" '*Spalding's* hyperbolic statement leaves the impression that a judge will be reversed only if it can be found that he acted egregiously—the result evidencing "perversity of will", the "defiance [of judgment]", "passion or bias". To repeatedly invoke this overstatement leads lawyers and judges to believe that a discretionary decision is virtually immune from review and leads appellate courts to view

our examination of the decisions convinces us that, on review of a trial court's order granting *remittitur,* this Court must simply determine if the lower court was "clearly erroneous" in light of its findings and the rules set forth in the precedents which guide us in determining when *remittitur* is permissible. GCR 1963, 527.1.

We now turn to the substance of plaintiff's claim. The following pertinent information relating to the value of the injured thoroughbred horse, Shapely Miss, was introduced at trial. Shapely Miss's pedigree could be traced back to Man-O-War, War Admiral, and other champion race horses. At the same time, however, Shapely Miss, herself, had a singularly undistinguished career as a race horse, finishing in the money some 12 times in 71 to 83 races (depending on whose testimony is accepted), and winning lifetime earnings of approximately $28,000. Plaintiff attempted to show that Shapely Miss's greatest value was for breeding as a "brood mare".

Plaintiff's expert on damages, Penelope Lapinski, testified that over her lifetime Shapely Miss could be expected to produce 9 to 12 foals with a value in the range of $125,000 to $175,000, which is the value she assigned to Shapely Miss. After the trial court issued its opinion rejecting plaintiff's proposed measure of damages, namely, the difference between the value of the horse before and after the accident plus the value of the anticipated foals,[5] plaintiff's counsel again questioned Ms. Lapinski as to the value of Shapely Miss:

any challenge to such a decision as esentially unfounded. Repetition of this statement is simplistic and misleading, and should not be indulged in by this Court or any other.' " *Id.,* p 489, fn 5.

[5] The trial court was, of course, correct in this regard. The market value of Shapely Miss would simply be enhanced because of her expected ability to produce a number of foals. Rather than a separate component of value, Shapely Miss's apparent ability to produce 9 to 12 foals would constitute an integral factor setting her market value.

"*Q.* The first question I want to ask you, Mrs. Lapinski, is this: And I go slowly because this is rather lengthy.

"Based upon what you know of Shapely Miss, her pedigree, her racing record and assuming a life expectancy of from 14 to 18 years, and assuming a production during this period of time as a brood mare of approximately 9 to 12 foals, and considering the kind of stallions Shapely Miss could have been bred with by the Guzowskis and considering what you know of her confirmation, do you have an opinion, based upon a reasonable degree of certainty what the market value of Shapely Miss would have been as a brood mare on November 8th, 1978 before the fifth race?

"Do you have an opinion?

"*A.* Yes, sir.

"*Q.* What is your opinion?

"*A.* I would have to remain with my other opinion of $125,000 to $175,000."

Ms. Lapinski then opined that, after the accident which crippled Shapely Miss, the horse had no value.

Lorraine Guzowski, plaintiff's daughter, testified that she was a trainer of race horses and had been in this occupation for 18 years. She testified that the following criteria are important in assessing a brood mare's value: (1) pedigree, paticularly if the mare is a descendant of stake winners; (2) the general structure, conformation, stamina, and bone structure of the horse; (3) the quality of other brood mares produced by the same sire; and (4) the quality of foals produced by the offspring of the sire which fathered the brood mare whose value is to be determined. Ms. Guzowski stated that she kept abreast of horse values and that there had been an "extreme up-shot" in the value of horses in the few years preceding the trial. In her opin-

ion, Shapely Miss was worth $150,000 to $250,000 before the accident and had a negative value after the accident.[6]

Defendant's expert on valuation, Lee Sheridan, basically agreed with Ms. Guzowski's criteria for determining the value of a brood mare. Nonetheless, he had a dramatically different opinion of Shapely Miss's value. He testified that in June, 1974, Shapely Miss ran in a claiming race (which is a race in which the owners of all the participating horses are offering them for sale) and the price for Shapely Miss then was $6,500. Mr. Sheridan found this to be significant.

Based upon the average price paid for horses of all types and ages at the Keenland Stables in Kentucky, Mr. Sheridan valued Shapely Miss at $5,000 to $10,000, with a fair market value of approximately $8,000. He further testified that the highest price paid for a brood mare at the Keenland Stables in January, 1979, was $145,000.

In its opinion granting *remittitur,* the trial court said:

---

[6] After Ms. Guzowski gave her opinion as to the value of Shapely Miss, plaintiff's counsel asked the court to rule that she was qualified to give expert testimony on the issue of valuation. The following then occurred:

*"The Court:* Well, she's a trainer, expert trainer, 18 years as a trainer.

*"Mr. Toohey:* She's also an owner.

*"The Court:* Evidence is in the record. Jury can consider it. They determine the weight to be given to it, et cetera. It's in the record.

*"Mr. Toohey:* That's true.

*"The Court:* I don't think at this point I have to make any determination as to the background of the witness. Jury has heard everything there is to be heard and it's up to them to make their decision as to credibility, weight. I'll tell them all that; of course they know that."

The trial court never did determine if Ms. Guzowski was or was not an expert on the valuation of horses. However, we are satisfied that she was qualified by "knowledge, skill, experience, training, or education" to testify as an expert. MRE 702.

"This court finds that the jury verdict was based not upon the facts relating to market value of the horse after its injury in 1978, but, rather, upon a desire to punish the defendant for bringing about a deliberate injury to Shapely Miss. This desire is understandable, however, this case is not a personal injury case. Exemplary damages are not allowed, nor, are any other damages other than the dimunition in market value as previously stated. The only plausible explanation for the jury award is the persuasiveness of plaintiff's counsel and the jury's desire to punish the defendants. In this regard, the jury was misguided."

Although plaintiff's complaint included an allegation that defendant's agents had intentionally caused the injuries, the case was submitted to the jury solely on the negligence theory. In our opinion, although neither party presented particularly compelling evidence of Shapely Miss's value at the time of her injuries, the jury's verdict was within the permissible range of the evidence produced.

The trial court determined that Ms. Lapinski's testimony was not credible because her estimate of Shapely Miss's value was based upon the value of future foals. While Ms. Lapinski's original estimate did indeed appear to be based exclusively upon the value of Shapely Miss's future foals, after the court ruled that the value of the mare's unborn offspring was not an element of damages, Ms. Lapinski continued to adhere to her original opinion that Shapely Miss was worth $125,000 to $175,000. This opinion was based on essentially the same criteria deemed important by the other two witnesses on value—Lorraine Guzowski and Lee Sheridan.

Assuming, however, that the court correctly rejected all of Ms. Lapinski's testimony, Ms. Guzowski set the value of the horse at from $150,000 to $250,000. In its opinion ordering *remittitur,* the

court never even mentioned Ms. Guzowski's valuation testimony which clearly was not based exclusively on the value of Shapely Miss's unborn foals.[7] While Ms. Guzowski was plaintiff's daughter, it was for the jury to assess her credibility.

The court's decision to order *remittitur* was based entirely on Lee Sheridan's testimony. However, this testimony suffered from its own internal inconsistencies and problems. Mr. Sheridan computed an average sales price for all horses sold by one stable in Kentucky. In 1978, this average was $28,000. Mr. Sheridan admitted that brood mares typically commanded higher sales prices than other horses, yet his estimate of Shapely Miss's fair market value was $8,000, significantly less than even the average price paid for all horses sold by the Keenland Stable. Moreover, in comparing the quality of a particular brood mare to Shapely Miss, Mr. Sheridan indicated that "this one is probably much closer to Shapely Miss", and this horse had been sold for $65,000.

On cross-examination, Mr. Sheridan admitted that looking at the price paid for other brood mares sired by Shapely Miss's father would be "one factor" in assessing her value. However, he had not examined such sales prices. Moreover, Mr. Sheridan believed that Shapely Miss had a fairly unexceptional pedigree, and that pedigree constituted 40% to 50% of a brood mare's value. On the other hand Ms. Lapinski thought Shapely Miss had an excellent pedigree.

In short, the evidence was conflicting and supported a range of possible verdicts. Although damages in this case were to be evaluated by a definite

---

[7] Indeed, Ms. Guzowski's testimony concerning the four basic factors important in determining the value of a horse were the same criteria used by defendant's expert, Lee Sheridan.

rule, namely, the difference in the market value of Shapely Miss before and after the accident, the testimony concerning her preinjury value varied dramatically. The jury's verdict was within the range of the evidence presented.

We are unable to conclude that the jury's verdict evinces bias, prejudice, passion or the like. Nor does the jury's verdict shock our collective judicial conscience. In our opinion, the trial court clearly erred in substituting its judgment on damages for the jury's.

Reversed and remanded for reinstatement of the original verdict. Plaintiff may tax costs.