# STATE OF MICHIGAN

# COURT OF APPEALS

LARRY ELVIN,

        Plaintiff-Appellee,

v

KARL GUBERT, DVM,

        Defendant-Appellant.

UNPUBLISHED
August 9, 2016

No. 326563 and 326566
Lapeer Circuit Court
LC No. 11-044707-NM

Before: K. F. KELLY, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this veterinarian malpractice action arising out of the death of a horse, a jury awarded plaintiff, Larry Elvin, $80,000 against defendant, Karl Gubert, DVM. The trial court entered a judgment in the amount of $198,049.09, which reflected the jury's $80,000 award, as well as $118,049.99 in case evaluation sanctions. In this consolidated appeal, defendant appeals as of right the calculation of damages, the trial court's jury instructions, and case evaluation sanctions award.

## I. BASIC FACTS

On February 6, 2010, defendant appeared at plaintiff's farm to castrate plaintiff's two-year-old Pennsylvania Standardbred horse, Abundance Star. Shortly after the procedure, the horse seized-up, stopped breathing and died. A necropsy performed two days later was inconclusive about the cause of death, but it was noted that Abundance Star had a small and diseased liver, which potentially impacted his ability to metabolize anesthesia. It was plaintiff's theory at trial that defendant was hurried when he arrived at the farm and failed to perform a proper physical before sedating Abundance Star. This haste, along with defendant's failure to properly monitor the horse during the procedure caused the death. In contrast, defendant maintained that he did nothing out of the standard of care and that, if anything, it was the horse's liver that caused the death.

At trial, there was testimony regarding horse-racing in general. The witnesses agreed that there was no longer a way to make money racing horses in Michigan. It was far more profitable to race in Pennsylvania, which had state-sponsored gaming. At the time of his death, Abundance Star had not yet raced, yet plaintiff and the horse's trainers believed that Abundance Star had tremendous potential. Each party offered an expert appraisal. Plaintiff's expert valued

-1-

Abundance Star at $100,000. Defendant's expert initially valued Abundance Star at $6,600, but adjusted that figure to a "salvage" value of $500.

The jury found defendant professionally negligent and awarded plaintiff $80,000. The trial court denied defendant's motion for new trial or remittitur and entered a judgment in the amount of $198,049.09, which reflected the jury's $80,000 award, as well as $118,049.99 in case evaluation sanctions. Defendant now appeals as of right.

## II. CALCULATION OF DAMAGES

Defendant argues that the trial court should have granted his motion for new trial or remittitur based on an excessive award of damages. We disagree.

"[I]t is well established in Michigan case law that an appellate court may not disturb a trial court's order of remittitur unless it determines that there has been an abuse of discretion." *Palenkas v Beaumont Hosp*, 432 Mich 527, 533; 443 NW2d 354 (1989). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Zaremba Equip, Inc v Harco Nat Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013). "We review all the evidence in the light most favorable to the nonmoving party." *Silberstein*, 278 Mich App at 462.

At trial, plaintiff's expert, Gord Wadds, testified that he performed a posthumous appraisal of Abundance Star based on information he received from the trainers, as well as other pertinent data. Wadds limited the appraisal to the physical condition of the horse and assumed that Abundance Star was medically sound. Wadds also looked to Abundance Star's pedigree. Wadds prepared four comparables based on the sale of other standard bred horses. All of the comparables were three-year-old Pennsylvania-bred horses sold at public auction for $50,000, $45,000, $95,000, and $87,000. Ultimately, Wadds valued Abundance Star at $100,000 based on all pertinent information and in light of the Pennsylvania Stakes program, which had a strong government-backed gaming program. Wadds explained:

> So when [one of the trainers] told me – and if I remember correctly, he referred to it as conservatively – the potential for this horse to earn up to 200,000. And, again, I verified that as I studied this Pennsylvania program. I didn't appraise this horse at 200,000. I appraised him at 100,000. Why? Because comfortably the potential is strong for him to earn that. And a horse is worth what – a racehorse, more particularly, is worth what they are in place to earn. Here was a horse that was serviceably sound, training well, had to get gelded. He was a little more overly concerned with his testosterone than he was with his job. That was taken care of and the doors were open for success. My appraisal is conservative and I'm very comfortable with it.

Defendant moved for a directed verdict, arguing that plaintiff had not presented valid evidence regarding Abundance Star's value at the time of his death, but instead focused on his value as a racehorse. The trial court disagreed:

> The evidence was that the horse that was bred, the sire, so to speak, was this Pennsylvania-bred horse, and that's the whole key, that this horse had unique

value. When I say "this horse," Abundance Star, was because of its pedigree, and pedigree was key in all these situations. And in order to go down that same path for Mr. Elvin to be eligible to have races in Pennsylvania, apparently you need to have a Pennsylvania-bred animal, and the stakes, the races, the amount of money, the value of those horses are significant.

Defendant's expert, Jonathan Osborn, then testified regarding his appraisal. Like Wadds, Osborn looked to Abundance Star's pedigree, race history and comparables. However, Osborn was careful not to place too much emphasis on Abundance Star's potential because having the "ability" does not mean that it is "proven." Osborn did not believe that Wadds' comparables were appropriate because they were "proven winners" whereas Abundance Star had never been on the track. Osborn viewed the Pennsylvania purses as mere speculation. Osborn's comparables were far less than Wadds – $7,500, $6,900, $5,000, $2,700 and $11,000. Osborn initially valued Abundance Star at $6,600. However, once he learned about Abundance Star's liver disease, the value was adjusted to $500.

At the close of proofs, the trial court instructed the jury: "In this case, Mr. Elvin claims damages to his horse, Abundance Star. If you decide that Mr. Elvin is entitled to such damages, the amount should be measured by the value of the horse and the expenses incurred by Mr. Elvin because of the loss of the horse." The jury rejected both experts' figures and arrived at the amount of $80,000.

Thereafter, defendant filed a motion for remittitur or new trial, arguing that Wadds' testimony was speculative and was based on Abundance Star's future earnings as a racehorse. Defendant argued that the award should be adjusted to the highest value that the evidence supported -- $6,600.

A new trial may be granted where excessive damages appear "to have been influenced by passion or prejudice." MCR 2.611(A)(1)(c).

> The power of remittitur should be exercised with restraint. When deciding whether to grant a motion for remittitur, the trial court must examine all the evidence in the light most favorable to the nonmoving party to determine whether the evidence supported the jury's award. If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed. [*Taylor v Kent Radiology*, 286 Mich App 490, 523; 780 NW2d 900 (2009) (internal quotation marks and citations omitted).]

In determining whether the jury award was supported by the evidence, a trial court must look to "objective criteria relating to the actual conduct of the trial or the evidence presented." *Silberstein v Pro-Golf of Am, Inc*, 278 Mich App 446, 462; 750 NW2d 615 (2008). The considerations include: "(1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable with awards in similar

cases both within the state and in other jurisdictions." *Freed v Salas*, 286 Mich App 300, 334; 780 NW2d 844 (2009).

In denying defendant's motion for remittitur, the trial court ruled:

> [T]he damages in this case are limited to the replacement cost of Abundance Star – i.e., the market value of the horse at the time of his death. Both parties agree that Plaintiff's damages are restricted to Abundance Star's replacement value at the time of death. That amount, however, is vehemently disputed. Defendant argues that the highest amount supported by the evidence is the $6,600.00 appraisal by defense valuation expert, Johnathan Osborn. Plaintiff, by contrast, contends that the lowest amount supported by the proofs is $100,000.00, which is the valuation of Plaintiff's valuation expert, Gordon Wadds.
>
> During trial in this matter, each party was free to, and did, introduce proofs in support of its own expert's valuation as well as proofs challenging the valuation of the other side's expert. It was for the jury to judge the credibility of the witnesses and determine the weight to be given to the evidence presented. The jury did just that and reached a verdict of $80,000.00.

Defendant nevertheless argues that the jury's award was excessive because it was based, at least in part, upon the witnesses' testimony that Abundance Star had the potential to win purses in Pennsylvania and, because Abundance Star had never raced, such testimony was speculative and beyond the proper measure of damages.

"Pets have long been considered personal property in Michigan jurisprudence." *Koester v VCA Animal Hosp*, 244 Mich App 173, 176; 624 NW2d 209 (2000). Consequently, "the appropriate measure of damages in cases involving the negligent destruction of property is simply the cost of replacement or repair of the property." *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 240; 828 NW2d 660 (2013). When calculating damages:

> The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action. A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits. Thus, when the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question. Questions regarding what damages may be reasonably anticipated are issues better left to the trier of fact. [*Health Call of Detroit v Atrium Home & Health Care Services, Inc*,

268 Mich App 83, 96-97; 706 NW2d 843 (2005) (internal quotation marks and citations omitted).]

The parties in the lower court cited to and relied upon *Guzowski v Detroit Racing Ass'n, Inc*, 130 Mich App 322; 343 NW2d 536 (1983). In *Guzowski*, the plaintiff brought an action against the defendant after the plaintiff's horse was crippled. The jury awarded the plaintiff $136,000 but the trial court ordered remittitur, finding that the jury's verdict was based, not upon the facts relating to the horse's market value, but on the jury's desire to punish the defendant. *Guzowski*, 130 Mich App at 323-324, 334. The trial court rejected the plaintiff's expert's testimony because it was based on the value of the horse's future foals. *Id.* at 334. In reversing the trial court, our Court first noted that "the proper measure of damages in this case is the difference in the market value of the horse after it was injured from its preinjury market value." *Id.* at 328. It then concluded that the trial court had erred in ordering remittitur because it had ignored the owner's testimony regarding the value of the horse and had ignored defendant's expert's inconsistencies. *Id.* at 335. The Court concluded:

> In short, the evidence was conflicting and supported a range of possible verdicts. Although damages in this case were to be evaluated by a definite rule, namely, the difference in the market value of Shapely Miss before and after the accident, the testimony concerning her preinjury value varied dramatically. The jury's verdict was within the range of the evidence presented.
>
> We are unable to conclude that the jury's verdict evinces bias, prejudice, passion or the like. Nor does the jury's verdict shock our collective judicial conscience. In our opinion, the trial court clearly erred in substituting its judgment on damages for the jury's. [*Id.* at 335-336.]

It is clear from the foregoing that the measure of damages was properly limited to Abundance Star's market value. The damages were not remote, contingent, or speculative; instead, damages were based on Abundance Star's value at the time of his death. Wadds' computation was based on Abundance Star's pedigree, training, physique, and Pennsylvania's state-sponsored horse racing industry. It was not based on lost earnings. Because there was conflicting evidence regarding the proper measure of damages based on the difference in the market value of the horse after it was injured from its pre-injury market value, the trial court properly denied defendant's motion for remittitur/new trial. The jury's verdict was within the range of the evidence presented.

## III. JURY INSTRUCTIONS

Defendant argues the trial court erred when it looked to the standard jury instruction in M Civ JI 12.01, which allowed a jury to infer negligence from defendant's lack of record-keeping. We disagree.

> Claims of instructional error are reviewed de novo but the determination whether an instruction is accurate and applicable is reviewed for an abuse of discretion. Reversal based on instructional error is only warranted where failure to vacate the jury verdict would be inconsistent with substantial justice. It is error to

instruct the jury on a matter not supported by the evidence. [*Guerrero v Smith*, 280 Mich App 647, 661; 761 NW2d 723 (2008).]

At trial, plaintiff repeatedly delved into the fact that, other than a bill, there was no record of what occurred the day of the castration and that defendant had no record of the narcotics maintained in his veterinary practice. Defense counsel countered that there was no causal connection between defendant's poor record-keeping and Abundance Star's death. Defense counsel pressed plaintiff's expert, Kelly Farnsworth, DVM:

> *Q*. Here's my question. I know what the medical record is. It doesn't say anything. My question is this. Dr. Gubert may indeed have utilized the drugs that he testified under oath that he utilized, correct?
>
> *A*. That is correct.
>
> *Q*. And he may have utilized those drugs in the dosages he indicated under oath, correct?
>
> *A*. He may have, yes.
>
> *Q*. And in this case, in fact, the medical chart being nonexistent, that wasn't the cause of this horse's death, was it?
>
> *A*. Lack of a medical record? No. That was not the cause of this horse's death.

Likewise, defendant's expert, John Stick, DVM, testified:

> *Q*. Did the lack of records in this matter cause the death of this horse?
>
> *A*. No.
>
> *Q*. Was the lack of records a proximate cause of any damages or injuries the Plaintiff has suffered in this case?
>
> *A*. No.

At the close of proofs, there was a discussion regarding the proper jury instructions. Defense counsel argued that Civ JI 12.01 was inappropriate because the instruction was only proper if the evidence supported a finding that the statutory violation was a proximate contributing cause of the occurrence. Defense counsel pointed out that even plaintiff's experts testified that lack of medical records did not cause Abundance Star's death. The trial court nevertheless concluded that Civ JI 12.01 should be given, noting that the instruction included language that "'[i]f you find that the defendant violated this statute before or at the time of the occurrence, you may infer that the defendant must be negligent. You must then decide whether such negligence was the proximate cause of the occurrence.'" The trial court added that it was "satisfied that [Civ JI] 12.05 is also appropriate in regard to this matter, violation by Defendant of the rules and regulations promulgated pursuant to statutory authority."

Thereafter, the trial court instructed the jury:

> We have a statute which provides that a licensed prescriber who dispenses controlled substances shall maintain records of the substances dispensed.[1] If you find that the Defendant violated this statute before or at the time of the occurrence, you may infer that the Defendant was negligent. You must then decide whether such negligence was a cause of the occurrence.

> The Department of Community Health in Michigan has adopted certain regulations pursuant to authority given to it by state statute.[2] Rule 21 of the Department of Community Health's general rules of veterinary medicine provide that a veterinarian who practices veterinary medicine in Michigan shall maintain a medical record for each patient that accurately reflect the veterinarian's evaluation and treatment of the patient.

> If you find that the Defendant violated Rule 21 before or at the time of the occurrence, such violation is evidence of negligence which you should consider together with all the other evidence in deciding whether the Defendant was negligent. If you find that the Defendant was negligent, you must then decide whether such negligence was a proximate cause of the damage to the Plaintiff.

> When I use the words proximate cause, I mean first that the negligent conduct must have been a cause of Plaintiff's injury; and, second, that Plaintiff's injury must have been a natural and probable result of the negligent conduct.

> There may be more than one proximate cause. To be a proximate cause, the claimed negligence need not be the only cause nor the last cause. A cause may be proximate although it and another cause act at the same time or in combination to produce the occurrence.

Jury instructions "should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Zaremba*, 280 Mich App at 26. However, "it is error to instruct a jury about an issue unsustained by the evidence or the pleadings." *Murdock v Higgins*, 454 Mich 46, 59; 559 NW2d 639 (1997). MCR 2.512(D)(2) provides:

> Pertinent portions of the instructions approved by the Committee on Model Civil Jury Instructions or the Committee on Model Criminal Jury Instructions or a predecessor committee must be given in each action in which jury instructions are given if

> (a) they are applicable,

---

[1] MCL 333.7321 and MCL 333.7303a.

[2] Mich Admin Code, R 338.4921.

(b) they accurately state the applicable law, and

(c) they are requested by a party.

M Civ JI 12.01 and M Civ JI 12.05 permit a jury to infer negligence from a defendant's violation of a statute or regulation. At trial, plaintiff focused on defendant's poor record-keeping to show that there was no way of discerning the dosages administered to Abundance Star on the day of the castration. Defendant simply testified "I don't have a record, but the proper dose was given to the horse." Not only was the patient record completely lacking, but defendant also failed to keep records of narcotics in general. Farnsworth testified that failure to keep proper records was below the standard of care. Defendant's own experts likewise agreed that failure to keep proper records, even if common practice in a country setting, was below the standard of practice. The jury was, therefore, properly instructed that it could infer defendant's negligence (i.e., breach of standard of care for a veterinarian) based on his failure to keep records. Notably, the instruction does not simply allow the jury to find defendant liable as a matter of law; rather, the jury was required to make a determination as to whether defendant's negligent record-keeping was the cause of Abundance Star's death.

Even if the trial court erred in giving the instruction, reversal is not required unless failure to do so would be inconsistent with substantial justice. MCR 2.613(A). "[T]here is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury." *Murdock v Higgins*, 454 Mich 46, 59; 559 NW2d 639 (1997). "Reversal is not warranted when an instructional error does not affect the outcome of the trial." *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008). There was sufficient evidence on the record from which a jury could find defendant liable for Abundance Star's death based on his failure to properly examine the horse pre-operatively and the failure to properly monitor the horse while it was under an anesthetic. Any error in instructing the jury did not likely affect the outcome of trial.

## IV. REFERENCE TO INSURANCE

Defendant next argues that it was error to allow the jury to hear that defendant had liability insurance and that, in the event of a remand, plaintiff should be instructed to refrain from repeating this inadvertent error. Having concluded that there was no error and, therefore, no need to remand we need not address this issue.

## V. ATTORNEY FEES

Defendant argues that the trial court's fee award was calculated using exorbitant hourly rates, particularly for lead counsel. We disagree.

"We review for an abuse of discretion a trial court's award of attorney fees and costs. An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Smith v Khouri*, 481 Mich 519, 526, 751 NW2d 472 (2008) (internal citation omitted).

MCR 2.403(O)(1) and (6) provides:

If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation.

***

For purposes of this rule, actual costs are

(a) those costs taxable in any civil action, and

(b) a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation, which may include legal services provided by attorneys representing themselves or the entity for whom they work, including the time and labor of any legal assistant as defined by MCR 2.626.

Defendant does not challenge that plaintiff is entitled to case evaluation sanctions where the unanimous case evaluation award was $28,500 and the jury's verdict was $80,000. At issue at the evidentiary hearing was the hourly rate and the number of hours claimed. Plaintiff requested $450/hour for lead attorney Anne Lawter (205.7 hours), Victoria Lehman (40.1 hours), Andrea Symbal (32.8 hours), Bruce Bigler (4.4 hours), and Beth Wittman (.5 hours).

At the hearing, medical malpractice attorney Gregory Bereznoff testified that he had tried a wrongful death case in Lapeer County in 2008 and had requested attorney fees in the amount of $400/hour. Bereznoff testified that he had previously rejected a veterinary malpractice claim because it was too much work without the commensurate pay-off of a medical malpractice action. He believed that veterinary and medical malpractice were similar in that both required the attorney to retain experts to testify as to the standard of care, breach, proximate cause. Experience was an important component of an attorney's effectiveness. Bereznoff had tried cases against Lawter and found her to be a formidable opponent: "I would put her in the category that I believe myself would be in, and that would be a reasonably competent lawyer who is doing medical malpractice work."

Lawter testified that she focused on medical malpractice defense and "veterinary malpractice plaintiff's personal injury work." She was previously with Kitch Drutchas Wagner Valitutti & Sherbrook, P.C. (Kitch) and was now with Giarmarco Mullins & Horton. Lawter had the highest rating in Martindale-Hubbell. She had tried at least 20 cases. Lawter, a horse-lover and equestrian, testified as to what made her uniquely qualified to handle this particular case:

Beginning in 1998 I exclusively practiced in the area of medicine, be it either veterinary medicine or human medicine, and my practice is primarily trial work; however, I also have engaged in representation of individuals before the State Boards of Medicine and in peer review credentially and administrative hearings both before the United States Equestrienne Licensing Body and State of Michigan Licensing Body. To keep going, if it's okay, I was appointed by Governor Engler to the State Board of Veterinary Medicine, which is a board that

I served on for six years, where the conduct of veterinarians was reviewed and opinions were issued with respect to suspension and disciplinary action. I have also been a licensed judge with the United States Equestrian Federation for almost 25 years in which I routinely and regularly have judged horse shows from California to Maine, including the World Championship horse shows for several different disciplines. I have, over the years, primarily focused my equine practice in administrative matters and matters before licensing bodies and small matters because of, in Michigan, the fact that the damages are limited to the value of the animal. So there have been only a few cases that I have agreed to take on on a contingency fee to prosecute veterinary malpractice.

Lawter testified that veterinary malpractice involved intense labor and the reward was hardly worth the risk. She had taken on very few cases "and every one of them I have been successful in negotiating a settlement prior to trial, and it was purely because of my expertise in the equestrian world, my understanding of horses, my understanding of veterinary medicine." Lawter was also well-acquainted with the castration process, having interned with a veterinarian before starting college. Lawter believed that this particular case was made more difficult due to the lack of records. Nevertheless, she was able to keep expenses "extremely low" due to her personal expertise.

Lawter explained why she was requesting the hourly rate of $450/hour:

Well, I believe the fee customarily charged for similar legal services is not clearly outlined within the 2014 Economics of Law Practice Report by the State Bar of Michigan because it does not take into consideration the expertise of veterinary law, equine law, and medical malpractice law as it specifically relates to the County of Lapeer. However, I believe it is entirely appropriate to look at the 95th percentile of attorneys practicing in Lapeer County as an appropriate rate and reflective of the expertise and skill necessary to prosecute a veterinary malpractice claim such as this.

The Bar that would have been surveyed for Lapeer County is very small; and, you know, the fact that we brought in a witness who has tried cases and prosecuted cases in Lapeer County . . .Mr. Bereznoff's office is in Troy and just like our office is in Troy, and most malpractice attorneys practice across the state; they don't practice in a specific locale. So I think it's appropriate to look at the 95th percentile of Lapeer County attorneys to get an accurate representation of the skill and appropriate hourly rate.

Lawter believed that veterinary malpractice was more in line with medical malpractice than personal injury work because of the need for scientific understanding.

Victoria Lehman testified that she attended Wayne State Law School on a full scholarship. She worked at Miller Canfield Paddock & Stone as a legal assistant prior to law school and then as a summer associate for two years. She spent a summer at Kitch and then started there immediately after law school. Lehman was a junior partner when she left in 2014

and focused almost exclusively on medical malpractice. She was now at Giarmarco, where she continued to focus on medical malpractice.

Lehman did not attend the whole trial and acknowledged that she lacked the equine specialty that Lawter possessed. Still, Lehman was involved in trial preparation and research and writing. She also helped with jury selection, preparing opening statements and preparing witnesses.

The Court in *Smith* first detailed what trial courts have been doing when calculating attorney fees, such as using the factors found in *Wood v Detroit Automobile Inter-Ins Exch*, 413 Mich 573, 588; 321 NW2d 653 (1982), that were derived from *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973). The factors are: (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. *Smith*, 481 Mich at 529. The *Smith* Court also recognized that many trial courts had been consulting the eight factors found in Rule 1.5(a) of the Michigan Rules of Professional Conduct, which are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *Id.* at 529-530. The Supreme Court further noted that trial courts have not limited themselves to only consulting the factors listed above. *Id.* at 530.

Recognizing that "some fine-tuning" was required, the *Smith* Court instructed that when determining an attorney fee pursuant to MCR 2.403, trial courts should first determine the "reasonable hourly rate [which] represents the fee customarily charged in the locality for similar legal services," and the trial court should rely on "reliable surveys or other credible evidence of the legal market." *Id.* at 530-531. The Court emphasized that the burden is on the fee applicant to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* at 531, quoting *Blum v Stenson*, 465 US 886, 895 n 11; 104 S Ct 1541; 79 L Ed 2d 891(1984). The Court then instructed that trial courts should multiply that number by the "reasonable number of hours expended in the case." *Smith*, 481 Mich at 531. The Court again emphasized that "[t]he fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* at 532. After this initial baseline figure has been calculated, "[i]n order to aid appellate review, a trial court should briefly discuss its view of the remaining [*Wood* and MRPC] factors" and whether such factors justify an upward or downward adjustment. *Id.* at 531.

In its written opinion, the trial court indicated that "although the instant matter concerned the alleged professional negligence of a veterinarian, this case is much like its theoretical ancestor, medical malpractice" in that the issues at trial were "not within the common knowledge and experience of a jury. Expert testimony was necessary for the jury to determine the

reasonableness of the disputed actions" and, therefore, "for purposes of this Opinion, this Court characterizes the present case as a medical malpractice action."

After discussing the *Smith* case, the trial court set Lawter's hourly rate at $425/hour and explained:

> In the present case, Plaintiff submits that $450 an hour is the customary fee in the locality for the services of his trial attorney, Anne Lawter, who has been a licensed attorney for approximately 18 years and is AV-rated by Martindale-Hubbell. Plaintiff, in support of that proposed hourly rate, produced the State Bar of Michigan's *2014 Economics of Law Practice: Attorney Income and Billing Rate Summary Report* (hereinafter "the state bar survey"). According to the state bar survey, plaintiff medical malpractice attorneys in the 95[th] percentile earned $1,000.00 an hour, attorneys in the 75[th] percentile earned $500.00 an hour, and the mean (i.e. average) billable rate was $474.00 an hour. The state bar survey, moreover, indicates that attorneys with 16 to 25 years of experience in the 75[th] percentile earned $350.00 an hour, attorneys (within that same range of experience) in the 95[th] percentile earned $488.00 an hour, and the mean hourly rate for attorneys (again, within the 16 to 25 year range) is $291.00. Specifically, in Lapeer County, attorneys in the 95[th] percentile earned $450.00 an hour, attorneys in the 75[th] percentile earned $250.00 an hour, and the mean hourly rate is $242.00 an hour.

> Plaintiff additionally relies on the testimony of Ms. Lawter at the December 5, 2014 hearing, during which she provided an extensive history of her practice of law and outlined specific experiences relating to the instant matter. Beginning in 1998, Ms. Lawter's primary areas of concentration have been medical malpractice defense and plaintiff's veterinary malpractice. Lawter, a lifetime equestrian aficionado, started an equine activity law practice at her former firm, Kitch . . ., and has been a licensed judge for the United States Equestrian Federation for the past 25 years. She, moreover, served for several years as a member of the Michigan State Board of Veterinary Medicine and the Disciplinary Sub-Committee.

> In light of the foregoing, Ms. Lawter is as qualified as any local practitioner in the areas of veterinary malpractice and equine law. This Court, therefore, is of the opinion that the customary fee in the locality for the services of an attorney of Lawter's caliber, experience, and expertise is $425.00 an hour. Although this fee is less than the mean billable rate for all plaintiff medical malpractice attorneys ($74.00), it is well above the hourly billing rate for attorneys with 16 to 25 years of experience in the 75[th] percentile ($350.00), and more importantly, falls within (but near the top of) the upper quartile (75[th]-95[th] percentile) of all Lapeer County attorneys ($250.00-$450.00).

The trial court then went on to set a reasonably hourly rate for the other attorneys involved in the case. It disagreed that Lehman, who had graduated from law school in 2008, should be compensated at the same hourly rate as Lawter:

-12-

With all due respect, Lehman's qualifications as it pertains to this particular case are far surpassed by those of Lawter. Ms. Lehman admitted as much during the evidentiary hearing, stating in pertinent part: "I don't share the equine specialty that Ms. Lawter had." That being said, it cannot be disputed that Ms. Lehman's competence as a young attorney is well beyond her years. Accordingly, this Court determines that $275.00 an hour is the customary fee in the locality for the services of an attorney with the skill-set and experience comparable to that of Ms. Lehman. This hourly fee falls [sic] exceeds the mean billing rate of attorneys with Ms. Lehman's amount of experience ($236.00) but falls just short of the rate earned by attorneys with the same experience level in the 75th percentile ($283.00). More importantly, an hourly fee of $275.00 falls within the upper quartile of all Lapeer County attorneys ($250.00-$450.00).

As for attorney Symbal, the trial court set a much lower hourly rate: "This Court does not question Ms. Symbal's legal abilities. However, based on her limited amount of experience, this Court determines that the fee customarily charged in the locality for comparable services is $205.00 an hour. This hourly rate, according to the state bar survey, is equal to both the mean fee earned by attorneys with 3 to 5 years of experience as well as the median fee earned by attorneys practicing in Lapeer County."

The trial court noted that Bigler had over 40 years of legal experience and had earned professional accolades. It concluded: "Based on Mr. Bigler's vast experience and first-rate credentials, this Court believes that the fee customarily charged in the locality for his services is $400.00 an hour. This fee falls within the upper quartile of attorneys with over 35 years of experience ($350.00-$525.00) and additionally falls within the upper quartile [of] all Lapeer County attorneys ($250.00-$450.00)."

Finally, the trial court concluded that "[i]n light of Ms. Whittmann's [sic] nearly 15 years of experience as a highly accomplished attorney, particularly in the area of appellate law, this Court determines that the fee customarily charged in the locality for her services is $375.00 an hour."

After setting the reasonable hourly rate, the trial court turned to the number of hours expended on the case. The trial court disagreed with defendant that the hours billed were inflated:

Defendant's contention ignores both the practical realities of litigation and trial preparation, generally, as well as the difficulties presented by this particular case. Similar to medical malpractice actions, this veterinary malpractice case required a host of knowledge regarding medical issues as well as proper care and treatment procedures. The case also commanded a thorough understanding of equine appraisal.

Having conducted a thorough review of the documentation submitted by Plaintiff, this Court is convinced that the attorneys billed an appropriate amount of time for the particular tasks performed. The billings are neither excessive nor duplicative. Rather, given the complexity of the case, the number of hours billed

by each of the attorneys could reasonably be expected to be greater, not less, when taking into consideration their experience and abilities. This is especially true of trial attorney, Anne Lawter, given her expertise in the areas of veterinary malpractice and equine law. For these reasons, this Court concludes that the amount of labor expended by each of Plaintiff's attorneys, as set forth in the billing statements, is reasonable.

The trial court awarded plaintiff's attorneys $107,121.50 in attorney fees, with the breakdown as follows:

- Lawter:        $425/hr x 205.7 hours = $87,422.50

- Lehman:        $275/hr x 40.1 hours = $11,027.50

- Symbal        $205/hr x 32.8 hours = $6,724

- Bigler:        $400/hr x 4.4 hours = $1,760

- Wittman        $375/hr x .5 hours = $187.50

The trial court declined to adjust the hourly fee upward or downward because the issues of professional standing, experience of the attorneys, and difficulty of the case had already been discussed: "For the sake of brevity, no comment on those particular factors is needed as they have all been previously touched upon, at least to some extent, in this Court's analysis of the customarily charged fees in the locality for each of Plaintiff's attorneys and the number of hours expended by each attorney." It found the remaining factors to be inapplicable.

On appeal, defendant does not take issue with the number of hours claimed; instead, he focuses only on what he perceives to be the "exorbitant" hourly rate of the lead attorney. However, a review of the testimony from the evidentiary hearing, along with the trial court's thorough opinion, suggest that the trial court did exactly what it was called upon to do under *Smith*. That is, the trial court set the attorneys' hourly rates by considering not only empirical data, but the attorneys' skill, experience, and reputation. That the trial court took particular care in setting the hourly rates is demonstrated by the fact that none of the attorneys received the same hourly rate and were considered in their individual capacities. The trial court's award is unassailable.

Affirmed. As the prevailing party, plaintiff may tax costs. MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause

-14-